THE MAYOR AND ALDERMEN OF THE CITY OF PATERSON

*v.*

THE EAST JERSEY WATER COMPANY.

[Decided May 14th, 1908.]

1. Where defendant, in a suit to restrain the diversion of the water of a stream to the injury of plaintiff's riparian rights, does not present by its answer the necessity of a preliminary settlement of the question of plaintiff's title to the riparian lands, the court may determine such question as one of law, where the facts as to title are undisputed and the determination rests on the construction of deeds.

2. In a suit to restrain the diversion of the water of a stream to the injury of plaintiff's riparian rights, the question whether the unlawfulness of the diversion depends on proof of actual perceptible damage, if the diversion is made permanent and for purpose of sale, is one the solution of which depends on the decisions of the courts of this state which control it, and therefore complainant, as a preliminary condition for equitable relief, will not be required to bring an action at law to reaffirm a right already settled as matter of general law.

3. A complainant seeking injunctive relief will not be compelled to first resort to a court of law to establish a preliminary question of title to land and of damage thereto, where defendant has not raised the question in his answer and the parties have argued and submitted such questions of legal right to the court.

4. A conveyance of land on a river above a dam described one tract of the land conveyed as beginning at a certain point and running "to the high-water mark on the northwesterly side" of such river. and running thence "along said high-water mark." Another tract was described as bounded on three sides by named monuments and on the other side "by high-water mark" of such river. The conveyance contained an express

exception from the land conveyed of all parts thereof that are overflowed by the stream. It also provided that the term "high-water mark" should be construed as the edge of the water in the river when the water is flowing at a height of six inches over the dam.—*Held*, that the conveyance did not convey the land under water to the centre of the stream, so as to constitute the grantee a riparian owner.

5. A municipal corporation, to whom land above high-water mark of a river had been conveyed for use as a park, received from the owners of the bed of the stream below high-water mark a conveyance of "such use as is customary and legal for riparian owners," and to that end the right of access and crossing as to "any intervening lands between high-water mark and the water" of the river, and also the right to ornament such intervening land, but provided that the grantee should not divert the water of the stream or interfere with the use of such water by the grantor in its maintenance of a dam at a lower point on the stream.—*Held*, that the deed did not, as far as upper riparian owners were concerned, convey a mere easement; but it granted a right of exclusive possession and occupation, and constituted the grantee a "riparian owner," entitled as such to prevent an unlawful diversion of the water of the stream by such upper riparian owners.

6. The owner of the bed of a stream, who also owns the riparian lands adjoining, may, as between himself and his grantee, sever the title and rights of the bed and *ripa*, and the right of contracting as to the use or control of the rights which, in the absence of express contract, would pass to the grantee of the *ripa* as natural riparian rights.

7. The rule that an owner of land cannot also possess an easement in such land is not applicable to the case of rights arising by operation of law from a condition fixed by the laws and forces of nature, such as riparian rights.

8. A conveyance of land on a fresh-water river, which contains a call "to the river," makes the river the boundary, and conveys the land to the centre of the stream.

9. A conveyance, describing the land as commencing at a certain point, and running thence southerly "to the river," thence "northerly parallel with the first course," and thence to the beginning, is not inoperative to render the grantee a riparian owner, in that the call along the river is omitted; but, to obviate the defect, the calls will be run backward, and the grantee will be given such a frontage on the river as will result from a paralleling of the side lines of the tract described.

10. Title by adverse possession for over thirty years up to the edge of a river and to the river bank creates the occupant a "riparian owner," entitled as such to protect his rights against the acts of upper riparian owners.

11. A deed describing the land conveyed as beginning at a river, and running thence to the river, and thence down the stream, conveys to the centre of the river.

12. A lower riparian owner is entitled to restrain an unlawful diversion of the water of a stream by a water company, though he fails to show actual perceptible injury from diminution of the quantity of the water,

where a continuance of the diversion may ripen into a right of appropriation by prescription, and the water company has made contracts with various persons and municipalities to supply water for long terms of years, with right of renewal.

13. A decision of the United States supreme court, putting the affirmance of the decree of a state appellate court on a ground different from that taken by the state court in its opinion, does not affect the binding authority of the decision of the state court as a judicial precedent on the questions covered by the affirmance.

14. The uses of water of a flowing stream must, in order to be reasonable, be consistent with the occupation and enjoyment of the riparian lands; and, where a water company diverts such a perceptible quantity of the water as to exclude the application of the maxim, *"De minimis non curat lex,"* and such water is used to supply its customers, some of whom are located in a different watershed, such use is unreasonable, and entitles a lower riparian owner to relief by injunction.

15. While the maxim, *"De minimis non curat lex,"* may not be applied to prevent the issuance of an injunction against the diversion of the water of a stream by a water company at a time when the water is at its lowest flow and there is a perceptible diminution in the quantity of water, the maxim may be applied to prevent injunctive relief, where the use is at a flood stage and the utilization consists in appropriating the surplus. or waste water.

16. In determining whether the maxim, *"De minimis non curat lex,"* shall be applied to prevent injunctive relief against the diversion of the water of a stream, the condition of the stream at the time of its lowest stage must be considered, and not the average flow, arrived at by taking all the stages of the water.

17. In a suit by a municipal corporation to restrain the diversion of the water of a river by a water company to the injury of riparian lands owned by the city, part of which was used as a park and a part for an engine house, evidence considered, and *held* sufficient to show an actual and perceptible diminution of the water to complainant's injury as a riparian owner.

18. Authority given by statute to a municipal corporation to establish a sewer system and to use a river as an outlet thereof does not put the municipal corporation in the position of a riparian owner, entitled as such to restrain a diversion of the water of the stream by an upper riparian owner, on the ground that the diminution in the quantity of the water causes the sewage to accumulate in the bed of the river and to subject the city to liability to lower riparian owners.

19. Where a municipal corporation claims the right by statute to pollute the water of a river by the discharge of its sewage, equity will deny it relief by injunction against the diversion of the water of the river by a water company for the purpose of supplying pure water to municipalities and private companies, and will remit complainant to any remedy it may have at law.

20. The assertion of defendant water company that complainant city, seeking to protect its rights as a lower riparian owner, was estopped to

complain of a diversion of the water of a river by its failure to object while the water company was constructing costly works to effect the diversion, is not sustained, where it appears that a notice of objection was served by complainant on an assistant civil engineer in charge of the work of construction, though it is not shown that the notice was ever received by defendant's officers.

21. A lower riparian owner is not estopped to complain of a diversion of the waters of a river by a water company by the fact that he makes no objection while the company is constructing costly works to effect the diversion.

22. The rule that the taking and injuring of private property for a public use will not be restrained, if compensation in damages can be made and defendant is willing to make such compensation, and a serious and manifest public injury would result from the issuance of an injunction, is confined in its application to the taking or injuring of property by agencies or public service corporations possessing the power of eminent domain.

23. An award of damages for an unreasonable diversion of the waters of a river to supply municipalities with pure water may be made in lieu of an injunction in a suit against a water company possessing the power of eminent domain, though the water taken from the river is sold to defendant company by another water company not possessing the power of eminent domain.

----

On bill for injunction. Heard on bill, answer, replication and proofs in open court.

The object of this bill, filed by the city of Paterson against the East Jersey Water Company, is to restrain the water company from the further diversion of any of the waters of the Passaic river which flows through the city. The water company in the year 1899 acquired a dam and reservoir at Little Falls, on the Passaic, about four miles above Paterson, and constructed there a large and expensive filter plant. In the same year it also constructed at the Great Notch on Hook mountain, near Paterson, a large reservoir, and from the latter part of the year 1899 it has taken from the river at Little Falls very large quantities of water for the purpose of supplying potable waters to various municipalities of the state, including the city of Paterson itself. From December, 1899, to May 23d, 1904, Jersey City was one of the municipalities thus supplied; and during this interval the amount pumped from the river at Little Falls was about fifty million gallons daily. Since the latter date Jersey City has re-

ceived its water-supply from the Rockaway river, a tributary of the Passaic above Little Falls, and the average amount drawn daily from the river at Little Falls by the defendant, from this date up to the time of the filing of the bill (May, 1905) and of the hearing, was about twenty-two million gallons. Of this amount about ten million are supplied to the city of Paterson and three million five hundred thousand to the city of Passaic. These cities are supplied from the low-pressure reservoir at Little Falls, and these waters are also filtered. The balance of the water diverted, about eight million five hundred thousand gallons daily, is drawn for the supply of smaller municipalities in Hudson and Essex counties, and of Little Falls, in Passaic county. Paterson and Passaic have been supplied with water from this source since the year 1899 by virtue of contracts of the East Jersey company, made, respectively, with the Passaic Water Company, incorporated in 1849, and the Acquackanonk Water Company, in 1867, for the purpose of supplying these cities, respectively, with water from the Passaic. Little Falls itself has been supplied since 1895 with the filtered water. The city of Bayonne and the town of Nutley have been supplied from the reservoir at Great Notch since November, 1899, and from May, 1904, water has also been supplied from this reservoir to the New York and New Jersey Water Company for Kearny, Harrison and East Newark; to the Montclair Water Company for Montclair, Bloomfield, Glen Ridge and West Orange, and to the Essex county freeholders for public institutions at Caldwell. Neither of the municipalities drawing their supplies, nor the water companies directly supplying them, are made parties to the suit, the East Jersey Water Company, as the company originally diverting the water, being the sole defendant.

The right of the complainant to enjoin this diversion by the East Jersey company is specially rested by the bill upon two different grounds. The first is its right as a lower riparian owner of lands to the flow of the river along and in front of its riparian lands, undiminished by such diversion, and the second claim is based on an alleged statutory authority to establish a sewer system with a discharge into the river. It is claimed that the amount of water diverted from the river at Little Falls by the

defendant company, and which is not returned subsequently to it (through the supply to Paterson itself), has so substantially and materially affected the amount of water into which the sewage of the city is discharged that the waters of the river within and below the city have become largely charged with sewage, making the river noxious and a menace to the health, damaging its parks and subjecting it to large claims of lower riparian owners for injuries resulting from the discharge of sewage.

The answer denies the right of the complainant to maintain the suit upon either ground. As to the claim based on riparian ownership, it insists that the complainant's title does not (as alleged in the bill) extend to the centre of the river, and at the hearing it was further insisted that, even if complainant is a riparian owner, no lower riparian owner can maintain any action for diversion against an upper riparian owner diverting for any purpose, or enjoin such diversion without proof of an actual, perceptible injury to such lower riparian lands, and that in this case it appears by the evidence that no such injury has arisen. As to the claim based on the city's right to the unobstructed flow of water for sewer purposes, the defendant, in the *first* place, denies the existence of any such authority or right; *secondly,* it insists that such right, even if conferred by statute on the complainant, could not and did not impose on the defendant, who is an upper riparian owner or occupant, any burden or obligation, in reference to its diversion of water, additional to the right to the use or flow of the water to which a lower riparian owner is by nature entitled purely as an owner of riparian lands, and could not as to such upper riparian owner give the city, in a capacity other than that of riparian owner, any rights to the use of the water additional to those inherent in a lower riparian owner, or more burdensome to the upper owner, and *thirdly,* as an answer to this claim, upon the facts of the case, it is insisted that the amount of sewage discharged into the river by the city of Paterson is so great that the entire natural flow of the river, if unobstructed, would be insufficient to carry it off, and that the amount diverted by defendant is so small a proportion of the entire flow that it has no material consequence on the efficacy of the river for sewer purposes.

In addition to these defences, which contest, either upon grounds of law or fact, the existence of any rights in complainant which are entitled to protection by injunction, the defendant in its answer and at the hearing asserts certain special equitable defences against the remedy by injunction, even if a legal right of action be established. These are, *first,* an estoppel of the complainant, arising from the fact that the complainant was apprised of the construction of its works, and of the laying of mains for the supply of the different municipalities, that it has sanctioned their construction and use, and has so acquiesced therein as to deprive it of any equity for injunction. As to the water supplied to the city of Paterson itself and to Passaic, there is further set up a special estoppel or bar to an injunction on the ground that the water companies were incorporated for the special purpose of furnishing water for Paterson and Passaic from the Passaic river, and before the authority to use the water for sewer purposes, and that by reason of this subsequent use these companies have been obliged to discontinue their drawing of water within and below the city, and have been obliged to resort to a water-supply for the cities above the waters polluted by the city; and further, that the city of Paterson itself is now, and since 1899, when the mains were laid through its streets for that purpose, has been supplied with all its water for domestic and fire purposes by the Passaic Water Company, which discontinued its former plant and laid down several miles of mains for the purpose of procuring this supply of pure water.

In addition to these grounds for estoppel or bar to injunction which concern or relate exclusively to the property rights or to the status of the defendant, the defendant, at the hearing and in the answer, as a reason for not granting an injunction, also sets up and relies on another aspect of the case, which affects public rights or uses of the river, considered as a source of potable water-supply. It is claimed that by reason of the pollution of the Passaic river below the city of Paterson, for which the city itself is mainly responsible, the use of the river as a source of potable water-supply to the inhabitants of the watershed and its vicinity has been destroyed, and that the municipalities below

the city of Paterson, which were formerly supplied either directly or indirectly from the lower Passaic, are now obliged to seek other sources, and that the only available source for all these municipalities now supplied by defendant is the upper Passaic. It is further claimed that the potable use of pure running streams is necessarily the paramount use, and one to which the mere riparian right should in equity be subject, as least so far as to disentitle the riparian owner, who shows no special damage different from that of other riparian owners to an injunction, and to remit him to compensation for the damage; and the defendant offers, both in the answer and at the hearing, to make such compensation, if it be determined by the court that the complainant has established such invasion of its rights to the undiminished flow of the waters as would in ordinary cases entitle it to an injunction for the protection of its right.

On that branch of the case relating to complainant's status as riparian owner, the special issues raised arise first from the special character of its deeds, and next from the dispute as to the real basis of a lower riparian owner's right of action for diversion of the flow of water by an upper owner. Complainant asserts riparian rights in respect to three tracts of land, two of them extensive tracts, known, respectively, as the West Side Park, located above the Great Falls, and East Side Park, below the falls, and the third a small lot, about twenty-two feet in width, located on the river a short distance below the falls. The bill alleges that as to each of these three tracts complainant's title extends to the centre of the river, and that as to each of them it is of right entitled to the full and unobstructed flow of all the water that naturally does and would flow through the river from its various sources and tributaries above Paterson; that defendant's diversion of water from the river for use at other places, without returning it to the river, has greatly reduced the quantity of water flowing by complainant's lands, and has caused the lands to become noxious, unhealthy and unsightly, and practically ruined for park purposes, and that the continuance of the diversion which is threatened will greatly reduce the value and usefulness of the lands and constitute an irreparable injury to its rights as riparian owner.

The defendant's answer denies that as to either of the three tracts the complainant's title extends to the centre of the river, or that it is entitled to the full and unobstructed flow of all the water that naturally flows through the river from its sources above Paterson. In reference to the extent and effect of its diversion of water at Little Falls, defendant denies that the water taken, or which could be taken, up to the full capacity of its mains, has constituted, or can constitute, a material diminution of the flow of the river, or can in any perceptible degree impair the value or usefulness of the public parks, or any of the lands adjoining the river, and that the injury to complainant is only fanciful and nominal. In reference to complainant's riparian rights, the ground taken at the hearing is that even if complainant, as the owner of the parks, makes out title as riparian owner to either of them, yet as such owner no right of action against diversion by an upper riparian owner or occupant exists, unless the diversion creates an actual, perceptible injury to the lower riparian lands. Complainant, on the other hand, claims that, as against a lower riparian owner, the diversion of water by an upper riparian owner, not for use upon riparian lands and return to the river, subject to or after such use, but for permanent abstraction from the river, and for purposes of sale, is not a reasonable use of the waters, and is of itself an infringement of the right of the lower riparian owner, irrespective of any question of actual or perceptible damage, and that for its protection against such unauthorized use, and to prevent the use from growing into an adverse right by appropriation, complainant is entitled to an injunction on the basis solely of its natural rights as riparian owner to the flow of the water, irrespective of the question of damage. Such damage, however, complainant claims to have proved, if it should be considered a necessary element of the right of action or relief.

This branch of the case, as to complainant's rights as riparian owner, embraces, therefore, three inquiries: *First,* the question whether complainant is, under its deeds, such an owner of lands as to be entitled to riparian rights against diversion of the water, and, if it be such owner, then, *second,* whether as against the diversion of the water by defendant for the purposes of sale, and

not for use on riparian lands, actual or perceptible damage from the ·diversion must be proved, in order to establish an impairment of the rights of a lower riparian owner, and if this be necessary, then, *third,* whether·such damage has been proved.

*Mr. John W. Griggs, Mr. William B. Gourley, Mr. Thomas C. Simonton* and *Mr. E. G. Salter,* for the complainants. · ·

*Mr. Michael Dunn* and *Mr. William H. Corbin* (*Collins & Corbin,* solicitors), for the defendant.

EMERY, V. C. (after stating the facts as above).

Taking up the first branch of the case, that relating to complainant's status as riparian owner, the *first* question, whether complainant's deeds make it such owner, and the *second,* whether actual damage must be proved to establish the right of action, a preliminary question as to the necessity of settlement of title at law is proper to be considered. Had the defendant by its answer raised the question of such preliminary settlement of the question of legal title at law, that course might, perhaps, have been directed at the hearing, if the proofs disclosed such dispute in reference to the facts on which the question of the nature of the legal title depended as to either require a settlement by a jury or entitle the defendant to such trial. But, on the whole proofs as presented, the question of the nature of complainant's title as riparian owner, and the impairment of its right by diversion for purposes of sale, arises, I think, as a question of law upon facts not disputed, and upon the construction of the deeds conveying title to complainant and claimed to constitute it a riparian owner. Assuming that the complainant, under its deeds and the undisputed facts, is, as riparian owner, entitled to protection as such against unlawful diversion, the further question, whether the unlawfulness of the diversion depends upon proof of actual, perceptible damage, if the diversion is made permanently and ·for purposes of sale, is a question the solution of which depends, as I think, on decisions of our own courts which control it, and therefore that complainant, as a preliminary condition for equitable relief, should not be required to bring a suit

at law merely for the purpose of reaffirming in a suit, *inter partes,* a right already settled as ·matter of general law. This matter of procedure requiring settlement of title at law was considered by me at length in *Oppenheim* v. *Brand,* referred to in *Oppenheim* v. *Loftus, 50 Atl. Rep. 795 (1901).*

The *third* question, that of damage proved, involves the extent and effect of the diversion on complainant's lands along the river, and also on the river itself, as a solvent for the sewage of the city, a long and expensive inquiry into the conditions of the river for a period of years, and it was to this point that the voluminous evidence upon both sides was mainly directed. This thorough investigation of the facts upon both sides was not only contemplated and concurred in by both parties, but the cause, on all these points involving questions of legal title, has been fully argued and submitted by counsel without any objection or request that the question of legal right be settled at law. Under these circumstances the rule in reference to cases where the objection is not raised by the answer, as laid. down by Vice-Chancellor Reed in *Coast Company* v. *Spring Lake, 56 N. J. Eq.* (*11 Dick.*) *615, 626, 627 (1898)* ; *affirmed on appeal, 58. N. J. Eq.* (*13 Dick.*) *586 (1899),* should be applied, and in the absence of any objection, either at the answer or on the hearing, the primary question of legal title or right should be examined and determined by this court. I proceed, therefore, with the first inquiry, relating to complainant's standing as riparian owner. Such standing as to any of the lots owned by it is denied, and, as different questions arise in respect to the complainant's title to each of the three tracts of land, these will be taken up separately.

The tract known as "West Side Park" is located on the north bank of the river about three-eighths of a mile above the Great Falls at Paterson, contains about thirty acres, and has a frontage on the river of about two thousand five hundred and fifty feet. This frontage, however, is not continuous, the park being composed of two tracts of land, separated by a stream called "Oldham brook," which flows into the Passaic above the falls and between the two tracts. The tract, below the brook and towards the falls, constitutes the main portion of the park, and it is connected with the smaller tract across the brook by a bridge. This

smaller or upper tract also borders on the river. The location of the park tracts with reference to Oldham brook and the river is important with reference to an arbitrary boundary line of high water, fixed by the conveyance to the city as one of the boundary lines of its lands. Below these lands, conveyed for a park, the Society for Useful Manufactures had erected a dam, just above the brink of the Great Falls, for the purpose of supplying water for manufacturing purposes. This society appears to have originally owned the whole property at this locality, including the bed of the river, and also the lands above, including the park lands of complainant. This fact, although not formally proved, was stated by counsel and accepted without objection, and, in view of the litigations in this court in which this ownership was shown, may properly be accepted, in the litigation between these parties, as a historical fact of general public interest relating to the rights in the river at this locality. *Society, &c.,* v. *Morris Canal Co., 1 N. J. Eq. (1 Sax.) 157; 21 Am. Dec. 41 (1830).* The dam extended across the river and flowed the lands above, and the Society for Useful Manufactures, in parting with title to these lands adjoining the river, fixed their boundary line with reference to the height of water at the dam. The West Side Park lands were part of these lands originally belonging to the Society for Useful Manufactures, and were conveyed to the city by a corporation called the Society's Land Company, which took over lands of the Society for Useful Manufactures. The conveyance to complainant describes the first (or large) tract as running, for its first course, from the corner of Totowa and Preakness avenue along the southwesterly line of Preakness avenue,

"to the high-water mark on the northwesterly side of the Passaic river; thence (2) southwesterly, westerly, and northwesterly along said high-water mark of said river and of Oldham brook their several courses to the southeasterly line of Totowa avenue."

From this point the description follows the line inland and away from the brook several courses to the beginning, and this part of the description has no bearing on the questions raised. The second tract (across Oldham brook and on the west side of it) is described as follows:

"All that tract of land bounded on the east by high-water mark of the Oldham brook; on the north by Totowa avenue; on the west by lands of the estate of Richard Van Houten, deceased; on the south by high-water mark of the Passaic river."

From these tracts was made an exception, followed by a definition of what line was intended by high-water mark in the description, and in the following words:

"Excepting, however, from the said tracts, and not conveyed, all parts thereof that are overflowed by the river and brook at the present height of the dam at high-water mark. It is understood and agreed that the term 'high-water mark' is the edge of the water in said river and brook when the water is flowing at a height of six inches over the dam of the Society for Establishing Useful Manufactures above the falls at the present height of the dam."

The deed also contained a covenant

"that the party of the first part [the Society's Land Company] shall not be liable for any damages caused by the overflow of said river and brook at the present height of said dam,"

and also covenants of general warranty as to all the land and premises conveyed.

In connection with this deed, which bounded the complainant's title toward the river by the line of "high-water mark" thus arbitrarily or rather artificially fixed, the city received a deed from the Society for Useful Manufactures itself, bearing the same date, conveying rights, privileges and easements in relation to the use of waters of the Passaic river and Oldham brook and the lands between this high-water mark and the water of the river and brook, upon certain conditions as to the diversion of the water of the Passaic and its use by the Society for Useful Manufactures, and as to the liability of the Society for Useful Manufactures for the overflow of the river and brook. By this deed, which it is important to set out at length, the Society for Useful Manufactures gave, granted, bargained and sold to the complainant, its successors and assigns,

"the right, privilege and easement to make use of the waters of the Passaic river and of the Oldham brook in front of and bordering on the lands conveyed to the party of the second part hereto by the Society's Land

Company by deed of even date herewith as is customary and legal for riparian owners, and for such purpose to have access and right to cross over any intervening lands between high-water mark and the water of the Passaic river and Oldham brook, and also the use of any such intervening lands for the purpose of ornamentation; but it is distinctly understood and agreed, and this grant is made upon this distinct condition and agreement, that such access and use shall not, and shall not in any way be construed to, give to the city of Paterson the right to divert the water of the Passaic river or interfere with its use by the party of the first part hereto, or to make any erection that would cause pollution of said waters, and that the party of the first part hereto shall not be held liable for any damages caused by the overflow of said river and brook at the present height of said dam. To have and to hold the said easement, right and privilege unto the said party of the second part, its successors and assigns, to its and their sole use, benefit, and behoof, forever. And it is further understood and agreed that the said conveyance by the Society's Land Company to the party of the second part hereto above referred to, to high-water mark of the Passaic river and the Oldham brook, carries the title of the party hereto of the second part to the edge of the water in said river and brook when the water therein is flowing at a height of six inches over the dam of the society above the falls at the present height of the dam."

The deed contained no other covenants, and was a deed of grant, bargain and sale for the expressed consideration of one dollar.

Under these deeds for West Side Park the complainant's title does not, as its bill alleges, go to the centre of the river, but its absolute title in fee is limited by an artificial or arbitrary boundary line beyond or above even the ordinary high-water mark of the river in its natural condition (unaffected by the dam), and this location of the line of title above the natural *ripa* is fixed with reference to the continuance in the Society for Useful Manufactures (which was the owner of the bed of the river) of the title up to a fixed boundary of the lands above its dam adjoining the natural *ripa*, with a right to overflow even above this limit if the existing dam caused such overflow. The title to the lands below this artificial or arbitrary line, and lying between this line and a line designated in the second deed as "the water of the Passaic river and Oldham brook," was reserved, or rather not conveyed, by the Society for Useful Manufactures, who thus continued to be the riparian owner of the lands on the banks of the natural stream. As such riparian owner it gave to the complainant certain rights to the use of the waters of the river and brook.

in connection with the lands conveyed. The use thus conveyed was described to be "such use as is customary and legal for riparian owners," and the waters of the river and brook, as to which these rights in the nature of riparian rights were granted, were the waters "in front of and bordering on the lands conveyed by the society's deed"—that is, if the boundary line fixed by that deed be intended, "the waters in front of the high-water line fixed by the deed." As between the Society for Useful Manufactures and the city, the effect of this clause of the deed, therefore, was to grant customary and legal riparian use of the waters from this high-water mark line to the centre of the river at least. Besides the riparian use of these waters, the deed further gave to the complainant, as to "any intervening lands between high-water mark and the water of the Passaic river and Oldham brook," the right of access and crossing for the purpose of making such use of the waters of the river and brook in front of and bordering on the lands conveyed by the society, and, what is important to notice, it granted also the use of these intervening lands for ornamentation. Such use was necessarily exclusive, and included such alteration or removal of the soil itself as requires this part of the grant to be considered, not as an easement, but as passing at least an unlimited right of possession, with a profit *a prendre,* or perhaps an absolute fee for this limited use. In either aspect, the city by this deed becomes entitled to the possession of the land constituting the natural *ripa,* subject, only, to the rights thereon reserved by grantor. The right to divert the water of the Passaic for its use, riparian or other, was expressly withheld, as also the right to interfere (by riparian use or other) with the society's own use of the water.

Riparian rights, strictly and technically so called, are rights not originating in grants, but arise by operation of law, and are called "natural rights," because they arise by reason of the ownership of lands upon or along streams of water, which are furnished by nature, and the lands to which these natural rights are attached are called in law "riparian lands." Riparian lands, in the language of the cases and treatises, include by nature as well the lands over as those along which the stream flows, and riparian rights are incident to lands on the bank, as well as those forming

the bed of the stream. *28 Am. & Eng. Encycl. L. (1st ed.) 947;* *2 Farn. W. § 463*. A right to the use of flowing water does not necessarily depend on the ownership of the soil covered by the water. *Lord* v. *Sydney City, 12 Moo. P. C. 473*. In this case the Society for Useful Manufactures, the owner of the bed of the stream, being at the same time owner of riparian lands adjoining, had, as between itself and its grantee, the right of severing the title and rights of the bed and *ripa,* and the right of contracting with reference to the use or control of the rights which, in the absence of express contract, would pass to the grantee of the *ripa* as natural riparian rights. In *3 Kent Com.* *\*434,* it is said the riparian proprietor may sell his upland to the top or edge of the bank and reserve the stream, and also that he may convey the bed of the stream separate from the land which bounds it. Riparian rights, as natural rights, and being incidents annexed solely by operation of law to the lands under and along the stream, differ in respect to the effect of contracts upon them, from those ordinary easements in lands whose only source is a grant (actual or presumed), and, by reason of this difference in the origin and character of the right, are not subject to that general rule relating to easements by force of which unity of ownership of the dominant and servient lands extinguishes the easement. This distinction is pointed out in the leading case of *Wood* v. *Waud, 3 Exch. 748 (Chief-Baron Pollock, 1849)* (at *p. 775),* and cases cited.

The reason on which the rule is founded, viz., that no owner can have an easement in his own lands, is not applicable to rights arising by operation of law from a condition fixed by the laws and forces of nature. As to rights in running streams thus arising, the incidents are annexed by operation of law, with the view of regulating an equal and continuous right of use in succession, and these continue to regulate the rights of riparian owners to access and use of the water, and its course was determined by nature, irrespective of any unity or division of ownership of the lands below and along the stream. These rights, therefore, attaching to the bed and bank of the stream and its waters as it was accustomed to flow by nature, are, as between upper and lower riparian owners, extinguished or affected only by the express

agreement or grants of the riparian owners, or by what, as against such owner, may become equivalent thereto—adverse user or appropriation. If this view is correct, then by the boundary fixed by the deed of the Society for Useful Manufactures to complainant, as "the waters of the Passaic river and Oldham brook," must be intended the water line of the river and brook as they were accustomed to flow in the natural condition and without regard to the effect of the Society for Useful Manufactures' dam on the water line; and it must further result that the restrictions of the use of those riparian rights naturally incident to the ownership of lands so bounded is operative only as against the grantor and by virtue of the express restrictions and reservations contained in the deed. As between the grantor retaining the bed ·of the stream and the grantee of the *ripa,* with restrictions or limitations by contract as to boundaries or other express limitations of the natural riparian rights, the rights conveyed may, perhaps, be strictly called "easements" or "privileges," and not "riparian rights." But as between the grantee of these rights from the riparian owner, who retains title to the bed of the stream and to lands overflowed, and an upper riparian owner or occupant, as to whom the grantor and those claiming under him are only riparian owners of lower riparian lands with their incidents, the grantee, as deriving title to certain riparian rights from such lower riparian owner, may be, by reason of such grant, a riparian owner, and entitled as against upper riparian owners or diverters to all the rights of a riparian owner conferred upon him by his grantor, the true riparian owner. Technically and legally, perhaps, such·rights, which are described to be of the character of riparian owners' rights, may be most accurately designated as "easements," because they arise by grant, and do not, like true riparian rights, arise by nature, by reason of the ownership of riparian lands, but they are easements which, as against upper riparian owners, are effective only to the extent that their exercise comes within the limits of the natural riparian rights of the lower owner.

This seems to have been the legal theory upon which the deed from the Society for Useful Manufactures to the city of Paterson rested, and I think it is the correct theory. This deed, as I con-

strue it, in effect conveyed to the city the right of exclusive possession and occupation, for the purpose of ornamentation, of the lands on the "waters of the Passaic river and Oldham brook," intervening between the waters of the river and brook and the high-water line of the deeds, and also granted the right of access and crossing over these intervening lands to the waters of the river and brook for the purpose of making that use of them which was characterized as a riparian owner's use of the waters of the river and brook, with the express agreement, however, that the right to divert the waters of the river (which is a natural riparian right) should not be construed to be conveyed by the deed, and that the Society for Useful Manufactures' own right of diversion of water or overflow, which otherwise was limited to natural riparian rights, should not be affected. These express limitations excluded the exercise, as against the grantor, of rights which otherwise would have been within the description of riparian rights; but as between the city, thus claiming under a lower riparian owner and an upper riparian owner or occupant diverting the stream, the effect of the deed, as I construe it, was to give to the city such right to the continued flow of the river along and past the lands occupied under the deed from the Society for Useful Manufactures, and extending as far as the natural *ripa* of the river, as the Society for Useful Manufactures itself, or any other lower riparian, would have. The city under this deed has not, it is true, derived any right, as against an upper riparian owner, to divert, for use as riparian owner or otherwise, the water as it passes its lands; but its present claim in reference to the West Side Park is based on the right to the flow past the park lands, and the injury alleged is a diversion of this water which would naturally flow past its lands, and from which diversion serious injury and damage to the park results. While, therefore, I find that the claim of title to the centre of the river opposite the West Side Park is not made out as alleged in the bill, I conclude that as to these lands the complainant, under its deeds, has, on facts not disputed, established the right of a riparian owner to the flow of the water of the river along and past the park lands, or at least so much of them as is occupied under the deed from the Society for Useful Manufactures, un-

diminished by the diversion of any person other than of its own grantor, for its use as reserved by the deed, and is entitled to assert such right as a basis of relief in this suit as against the defendant, an upper riparian owner or occupant, who diverts the water.

The second dispute as to riparian ownership arises out of the description contained in the deed to the complainant for the small tract, about twenty-two feet in width, fronting on Water street and called the "Engine House Lot." This lot was conveyed to the city by deed dated August 5th, 1869, and the description is apparently defective, the second course of the deed (which conveys by metes and bounds) being omitted. The description is

"all that tract of land and premises hereinafter particularly described, situate," &c., "in the city of Paterson," &c., "beginning on the southeasterly side of Water street at a point 5 feet 3½ inches westerly from the westerly side of the house of the heirs of Adrian B. Van Houten, deceased, running thence (1) southerly at right angles to Water street as the same has been laid out," &c., "to the Passaic river; thence (3) northerly parallel with the first course to the southerly side of Water street; thence," &c. (by two courses, 4 and 5), "still along Water street 21 feet 11 inches to the place of beginning."

The second course, that toward the river, is omitted, and it is insisted that, as the deed does not give any river frontage, complainant is not as to this lot a riparian owner, and its title does not, as alleged in the bill, extend to the centre of the river. In addition to the deed complainant proves, in reference to the engine-house lot, that from at least as far back as 1871 the city occupied the entire lot from Water street to the river for the purpose of an engine-house, and that along the river front there was a brick wall about fourteen feet high and standing on the edge of the water, which wall was used in connection with the occupation and use of the lot and the use of the river in front of it. Adverse possession for over twenty years of the lot, as extending to the edge of the river and including the whole river bank, has been proved, and the question is whether, either by the deed itself (notwithstanding the omission of the second course), or by this deed in connection with the proof of adverse possession of the *ripa,* complainant has, as to this lot, established

a title which gives it the right of a riparian owner to the flow of
the river along and past it.   My conclusion is in the affirmative
on both grounds, and for these reasons:

As to the lot conveyed by the description in the first course,
running "to the river," it must be considered that "the river" is
designated a boundary, and *prima facie* such designation takes
the course to the centre of the river, the rule being that, where
a fresh-water river is designated as a boundary, the centre line
of the river, the *"medium filum aquœ,"* is the boundary line.
*Arnold* v. *Mundy, 6 N. J. Law (1 Halst.) 1; 10 Am. Dec. 356
(Supreme Court, 1821, Chief-Justice Kirkpatrick)* (at *p. 67*);
*Attorney-General* v. *Delaware and Bound Brook Railroad Co.,
27 N. J. Eq. (12 C. E. Gr.) 631 (Court of Errors and Appeals,
1876, Justice Dixon)* (at *p. 636*).   And a line running "to the
river" generally, and without subsequent qualification or restric-
tion, extends by settled rules of construction to the centre of the
river—of the *"filum aquœ,"* or thread of the stream.   *Starr* v.
*Child, 20 Wend. (N. Y.) 149, 152; on error, 4 Hill (N. Y.)
369, 377, 380; note to ex parte Jennings, 6 Cow. (N. Y.) 549.*
An owner "to the bank of the river" owns to the centre of the
river.   Next, it is impossible to run the third course at all, com-
mencing from the terminating point of the first course and par-
allel with the first course, but the location of this third course
can be fixed by running the courses backward from the last
course.   Running these fifth, fourth and third courses from the
beginning and terminating point, a point from which the third
course is to commence is fixed as a point in a line commencing
on Water street, twenty-two feet eleven inches from the place of
beginning (the beginning of the fourth course as given in the
deed), and running parallel with the first course on a line to or
toward the river.   In the absence of any limitation by distance
of this line it can be thus limited only by the description that
it is parallel to the first line, which, by construction of law, ends
in the centre of the river.   The line, therefore, as matter of con-
struction and application of the description, will, I think, toward
the river side, be terminated at the single point where it is par-
allel to the termination of the first line on that side, and beyond
which mere construction cannot carry the title, viz., the centre of

the river. - The description as to the third course may, therefore, on the face of it, be construed and applied as if it read: "Thence (3) from the centre of the river," &c. If so read, then, notwithstanding the omission of the second course, the description has effect as the conveyance of a lot or tract of land fronting twenty-one feet eleven inches on Water street, and running between parallel lines that distance apart and at right angles to Water street to the centre of the river. This construction should, in my judgment, be adopted as giving effect to the conveyance, and as making it in fact the conveyance of a lot or tract of land, and in preference to a construction that would make the deed wholly ineffective, because of a faulty description by boundaries which do not include all sides of a lot. In other words, if the description in the deed itself, when applied to the land, conveys any lot at all, it must be a lot running to the centre of the river, for, when the river as a boundary is mentioned, it requires express words to restrict the conveyance to the side of the river, and the principle stated by Pothier applies that,

"where the grant to a riparian proprietor has no other boundary on the side thereof which is adjacent to the river, the legal presumption is that his grantor intended to convey to the middle of the stream." *4 Hill* (*N. Y.*) *373.*

Title by adverse possession for over thirty years up to the edge of the river and to the river bank is established beyond doubt, and this also is sufficient to establish title to riparian lands along which the river flows. On both grounds, therefore, I conclude that complainant is entitled to assert against defendant, as a diverter of the upper waters, such rights as a riparian owner may have in reference to this engine-house lot.

In reference to the third tract, the East Side Park, situate on the other side of the river below the falls, and fronting about one thousand five hundred feet on the river, the deeds conveying the portion of the park along the river, and referring to it as a boundary or monument, expressly describe the property as beginning at the Passaic river and as running to the river and down the river its several courses. The description in its deed undoubtedly conveys title to complainant to the centre of the

river so far as this park is concerned, and constitutes it a riparian owner in respect to these lands.

The defendant does not claim that this is not the legal effect of the deeds; but inasmuch as these riparian lands were, by the deeds to the city or its grantors, made subject to a right of flowage by the maintenance of a dam by a lower riparian owner, the Dundee Manufacturing Company, and as this flowage of the lands has continued for over forty years, it is claimed that defendant's diversion of water does not in any respect injure the complainant as owner of this park, and, in the absence of such injury, complainant has, as to this park, no legal or other right to be protected by injunction. But this objection manifestly relates, not to the question of whether complainant is a riparian owner of these lands and entitled to assert the title and right of a riparian owner, but whether the complainant as riparian owner, asserting such right, must establish injury or damage as a foundation for relief either at law or equity. This is an important question relating to riparian' rights, but very different from the question as to whether the complainant, claiming such right, is in law a riparian owner. On the first branch of the case I conclude that complainant, as to all of the lands in question, the two parks and the engine-house lot, is entitled to assert against the defendant the rights of a riparian owner.

The second inquiry on this branch of the case (complainant's riparian rights) is whether the proof of actual, perceptible damage, resulting from the diversion of water by the defendant, is essential in order to establish the existence of a right to be protected by injunction. The diversion by the defendant is not for the purpose of use upon or in connection with the enjoyment of upper riparian lands owned or occupied by it, and to be returned to the river after such use, but for permanent diminution of the supply of the river, made for the purpose of sale of the water for the ultimate supply to municipalities, all of which, except Paterson and Passaic, are distant from the river, and some of which are not within the watershed of the river. This circumstance, permanent diversion for the purposes of sale, is claimed to have a material bearing on the question of the relative rights of upper and lower riparian owners, and the necessity of proving actual,

perceptible damages as an essential element of a suit at law or right to an injunction.

The general rule upon the subject of the necessity of proving actual damage where a right is violated, and one applying to every description of right, was clearly stated by Baron Parke in *Embrey* v. *Owen, 6 Exch. 353, 368 (1851)*, a leading case involving a suit for diversion for the purposes of irrigation. He says: "Actual, perceptible damage is not indispensable as the foundation of an action, and it is sufficient to show the violation of a right, in which case the law will presume damage. *Injuria sine damno* is actionable, as was laid down by Lord Holt in *Ashby* v. *White,* and in many subsequent cases, all referred to in the very able judgment of Mr. Justice Story in *Webb* v. *Portland Manufacturing Co., 3 Sumn. (U. S.) 189 (1839)* ; *29 Fed. Cas. 506,* where the truth of this proposition is powerfully enforced." This latter leading case was a bill for injunction to restrain diversion by an upper riparian owner or occupant, and Mr. Justice Story, after a full examination of the cases, concludes (*29 Fed. Cas. 509*) that, whenever there is a clear violation of a right, it is not necessary in an action of the sort there brought to show actual damage, but that every violation imports damage, and if no other be proved the plaintiff is entitled to a verdict for nominal damages, and *a fortiori* that this doctrine applied whenever the act done is of such a nature that by repetition or continuance it may become the foundation or evidence of an adverse right. He also holds that, were the doctrine otherwise at law, if the diversion of the water is a violation of the plaintiff's right, and may permanently injure that right, and become by lapse of time the foundation of an adverse right in the defendant, no case is more fit for the interposition of a court of equity by way of injunction to restrain defendants from such an injurious act. This claim to an injunction, on the ground that otherwise the present appropriation by defendant may, by adverse exercise, ripen into a right and destroy complainant's right as riparian owner, is perhaps its strongest claim to the interference of the court for the ascertainment and declaration of complainant's present rights.

This results from the fact that the defendant from 1889 to 1904 diverted permanently from flowing into the river at Paterson about forty million gallons daily, and since May, 1904, has permanently diverted from the river between Little Falls and Paterson about twenty-two million gallons daily, and (taking the water diverted from Paterson, eight million or nine million gallons daily, above the falls, to be returned within the city limits below the falls) is now diverting between twelve million and thirteen million gallons daily from the flow of the river below the falls and the outlet of the Society for Useful Manufactures' raceway. This diversion, if continued, may give rise to an adverse right by appropriation to the extent now made; and it also appears, by the contracts of the defendant which have been put in evidence, that the water which it supplies, or has agreed to supply to the municipalities, either directly or through water companies, is not limited in amount, and that the contracts run for terms of years. It has contracted with the New York and New Jersey Water Company (*Exhibit C 24*) to furnish "an ample supply" in such quantity as required by the latter company's contract with the city of Bayonne, and for fulfilling any contract it (the New York and New Jersey Water Company) may acquire to supply water for use on Staten Island, and this contract is to continue till September, 1915, with a right of perpetual renewal with the same company. With the New Jersey Suburban Water Company it has contracted (*Exhibit C 25*) to supply all the water required for their present and future uses in that part of Hudson county lying west of the Hackensack river and including the township of Kearny. With the Montclair Water Company (*Exhibit C 26*) it has contracted to furnish an ample supply of water, sufficient for the contracts the Montclair company has already made with the West Orange company and the Orange Water Company, or contracts which may be made by it during the term of the agreement (1920), with right to perpetual renewal. No contracts, however, are to be made, except for water to Montclair, West Orange and Orange, without the East Jersey Water Company's consent. With the Little Falls company it agrees (*Exhibit C 27*) to deliver all the water sold by the latter company to Little Falls township, and

until 1923. To the Acquackanonk Water Company (*Exhibit C 28*) it agrees to deliver the water needed for its supply, the company being authorized to supply the city of Passaic and the township of Acquackanonk, but this contract may be canceled by either party on six months' notice. With the Passaic Water Company it agrees (*Exhibit C 29*) to receive from it at Little Falls all the water needed by the Passaic company (which has the right to supply Paterson and Manchester township), and, after pumping and filtering it, to deliver it to the Passaic Water Company at a conduit near Little Falls. By this contract the Passaic company agreed to take from the Passaic river at Little Falls and deliver into the headgates of defendant "so much water as may be needed for its purposes." This contract is also terminable on six months' notice by either party. The agreement with the town of Nutley (*Exhibit C 30*) provides for the delivery of "all water needed by the town or its inhabitants for private or public uses," and continues until December, 1914.

When we consider the extent of the territory now included in these contracts, and its rapidly increasing population, with consequent demands for pure water-supply, and the long terms of all the contracts, except with the Passaic and Acquackanonk companies, and the fact that the defendant by its answer and at the hearing insists that there has as yet been no violation of any legal right of the complainant, and asks dismissal of the bill upon that ground, there would seem to be no escape from the conclusion that complainant has shown a case where it is entitled to have the question of its legal right as riparian owner decided, and, if that right is found to be violated, then, in order to protect the acquirement of an adverse right, to have the right declared and protected by the court. In view of these denials of right by defendant and its contracts for long-continued and necessarily increasing future diversion, the maxim, "*De minimis non curat lex,*" can have no application to complainant's suit for present declaration and protection of its right, even if it should be concluded that up to this time the diversion, compared with the flow of the river, has been so slight as to bring the case within the maxim. My own conclusion on this point, as will hereafter appear, is that the present diversion relatively to the lowest flow

of the river is material, and that defendant's basis of comparing the diversion with the average flow cannot be admitted.

On the assumption, however, that this general rule protecting against the violation of legal right applies to the case of rights of riparian owners to running waters, and that the maxim, "*de minimis,*" does not apply, the nature of those rights must now be considered, for the reason that the present contention between the parties involves the question whether there is any violation of right, unless the diversion by an upper owner or occupant results in actual, perceptible damage, even if the diversion of the water is permanent and for the purpose of sale. The claim of the defendant is that a lower riparian owner's rights in the water are not violated or infringed by a diversion (for whatever purpose) of water which would otherwise reach him, unless the diversion occasions actual, perceptible damage. Under this view, the right of the lower proprietor to have the flow of the water continue past his land is not an absolute right to the entire flow, subject only to a reasonable use upon or in connection with upper riparian lands, but is the right only to have the flow continue subject to any diversion by an upper riparian owner, or under his authority, which does not perceptibly damage the lower owner. The complainant, on the other hand, claims that the lower riparian owner has the right to the full flow of the river over and along his lands, without diminution or diversion by an upper riparian owner, except to the extent of a reasonable use of the flowing water upon or in connection with his lands, and that, subject to such reasonable use, the water is to be returned to its accustomed channel on leaving the upper lands. On the latter theory any right of diversion is restricted to reasonable uses, and any diversion (not so slight as to come within the "*de minimis*" rule) for unreasonable or unauthorized purposes is a violation of the lower proprietor's right to the natural flow of the waters. If reasonable use by the upper owner is the test, then as the rights of diversion must be equal and common in all riparian owners, except so far as they are affected by the necessity of the use of being in succession and not simultaneous, the rule by which this reasonable use is to be gauged is the use and enjoyment of the flow of the water subject to the similar

rights of all the proprietors. The statement in *3 Kent Com. 489* is constantly referred to in all leading cases on this question of the character of the right in running waters as being perspicuous and authoritative, and so far as it bears on the point now under examination (whether permanent diversion for sale is a reasonable use) is as follows:

"Every proprietor of lands on the banks of a river has naturally an equal right to the use of the water which flows in the stream adjacent to his lands, as it was wont to run (*currere solebat*), without diminution or alteration. No proprietor has a right to use the water, to the prejudice of other proprietors, above or below him, unless he has a prior right to divert it, or a title to exclusive enjoyment. He has no property in the water itself, but a simple usufruct while it passes along. '*Aqua currit et debet currere*' is the language of the law. Though he may use the water while it runs over his land, he cannot unreasonably detain it, or give it another direction, and he must return it to its ordinary channel when it leaves his estate. Without the consent of the adjoining proprietors, he cannot divert or diminish the quantity of water which would otherwise descend to the proprietors below. \* \* \* This is the clear and settled general doctrine on the subject, and all the difficulty that arises consists in the application. The owner must so use and apply the water as to work no material injury or annoyance to his neighbor below him, who has an equal right to the subsequent use of the same water. \* \* \* Streams of water are intended for use and comfort of man, and it would be unreasonable and contrary to the universal sense of mankind to debar every riparian proprietor from the application to domestic, agricultural, and manufacturing purposes, provided the use of it be made under the limitations which have been mentioned; and these will no doubt inevitably be, in the exercise of a perfect right to the use of the water, some evaporation and decrease of it, and some variations in the weight and velocity of the current. But '*de minimis non curat lex*,' and a right of action by the proprietor below would not necessarily flow from such consequences, but would depend upon the nature and extent of the complaint or injury and the manner of using the water. All that the law requires of the party by or over whose lands a stream passes is that he should use the water in a reasonable manner, and so as not to destroy or render useless, or materially diminish or affect, the application of the water by the proprietors above or below on the stream."

That diversion for use upon riparian lands and for domestic and agricultural or manufacturing purposes is in its nature a reasonable use is the settled law of this state, and diversion for irrigation has also been held to be a reasonable use in accordance with the general American doctrine and the English authority. *Embrey* v. *Owen, supra; Farrell* v. *Richards, 30 N. J. Eq. (3*

*Stew.*) *511* (*Chancellor Runyon, 1879*). At the time of the filing of the present bill there had been no decision in any of our higher courts directly upon the question whether a diversion of water for purposes other than use upon or in connection with riparian lands, and in the absence of actual, perceptible damage, was in itself actionable as a violation of the lower riparian owner's right to the natural flow of the water. Chief-Justice Kinney in a *nisi prius* case—*Merritt v. Parker, 1 N. J. Law* (*Coxe*) *460* (*1795*)—with the concurrence of Justice Smith, charged the jury that either an illegal diversion of the water of a running stream or the increase of its flow was actionable, whether productive of injury or benefit. This charge proceeded on the general view that the water should be permitted to run in its accustomed course, in order that all those through whose land the stream pursued its natural course might continue to enjoy the privilege of using it for their own purposes, and it could not be legally diverted from its course without the consent of all who have an interest in it. In *Campbell v. Smith, 8 N. J. Law* (*3 Halst.*) *140* (*Supreme Court, 1825*), this statement of the law was approved, and it was held that a lower riparian proprietor, having built a mill for which use of the stream was required, had the legal right to tear down a dam erected on the stream above him for the purpose of diverting the waters of the stream to a mill operated on non-riparian lands, and a verdict directed in his favor was sustained. In *Hutchinson v. Coleman, 10 N. J. Law* (*5 Halst.*) *74* (*Supreme Court, 1828*), the defendant, a lower riparian owner, erected on his lands across the stream a dam, which backed water on plaintiff's lands and thus deprived him of the advantage of the full flow of the water. Plaintiff claimed that it affected the running of his mill, but the jury found that the dam was no detriment to his mill, and rendered a verdict for defendant. The court directed a new trial, one ground being (at *p. 78*) that each owner in succession was entitled to the full benefit of the flow and fall of the stream on his lands, and that a proprietor, claiming the right to diminish the quantity of water to descend below, must either prove an actual grant from the proprietor affected by his operations or must prove an uninterrupted enjoyment of twenty years. Chancellor

Pennington, in *Hulme* v. *Shreve, 4 N. J. Eq. (3 Gr. Ch.) 116 (1837)*, enjoined by preliminary injunction the interference with the flow of a stream, where serious and irreparable injury was threatened, reserving his opinion on whether the complainant could be compelled to submit to any change in the flow to which he was entitled, even if no injury resulted (at *pp. 125, 126*). Chancellor Vroom, in the important case of *Soc. U. M.* v. *Morris Canal Co., 1 N. J. Eq. (Sax.) 157; 21 Am. Dec. 41 (1830)*, denied a preliminary injunction where the defendant diverted waters of a stream to which complainants had a superior right under their charter, but claimed that they restored to the stream, before it reached complainant, water from another stream of as great an amount, and it did not appear that complainants were injured by this alteration in the supply. The learned chancellor was of opinion that the right to the flow without diminution or alteration was not a right to the flow of the very identical substance issuing from the original source, as this would be tantamount to the ownership of the particular water, which was impossible; the right being only in the use. In *Ten Eyck* v. *Delaware and Raritan Canal Co., 18 N. J. Law (3 Harr.) 200; 37 Am. Dec. 233 (1841)*, the right of an upper riparian owner to the ordinary and natural flow of the stream was asserted against the lower owner, who by embankments and a dam narrowed the stream and obstructed its flow; but as the case was heard on demurrer, and the destruction of complainant's crops and soil was alleged, the question of right of action without proof of damage was not here directly involved. In *Farrell* v. *Richards, 30 N. J. Eq. (3 Stew.) 511 (1879)*, Chancellor Runyon enjoined a riparian owner from diverting water for irrigation in a case where it appeared that so much water was withdrawn from the stream as to seriously affect complainant's water power and do there irreparable injury. The use for the purpose of irrigation, he declared (at *p. 515*), must be such as not essentially to interfere with the natural flow of the stream, or essentially and to the material injury of the proprietors below to diminish the quantity of water that goes to them.

These are the only New Jersey decisions bearing upon the necessity of proving damage or perceptible injury, in order to estab-

lish a right in the flow of streams, prior to the important case of *Higgins* v. *Flemington Water Co., 36 N. J. Eq.* (*9 Stew.*) *538* (*Court of Errors and Appeals, 1883*). As counsel on both sides rely on this case to support their opposite contentions upon this point, it must be examined at some length. In this case an upper riparian owner had granted the right to draw water from the stream to a water company which was supplying a village with water and for the purpose of supplementing their usual supply in times of drought. A bill filed by a lower millowner to restrain the diversion was dismissed by Advisory Master Dodd, no opinion being reported. On appeal it was held (Chief-Justice Beasley delivering the opinion) that as the *quantum* of water abstracted, though not great, would be so large as to work a sensible and essential detriment to complainants, it could not be disregarded under the maxim *"de minimis"* as contended by the water company (at *p. 541*). Whether the right of the riparian owner is shown to be violated by a diversion of this kind without proof of palpable damage the opinion does not undertake to expressly decide, and in the statement of the circumstances which showed a violation of the riparian owner's right the actual and perceptible damage caused by the diversion in included (at *pp. 541, 543, 544*). The general principles as to the use of the water are thus stated: "It is settled that the right of flowing is an incident to the proprietorship of the lands along or over which such stream flows, that such right is common among all such proprietors, that each of them is entitled to its reasonable use, and that so long as such use be reasonable a co-proprietor cannot complain of the consequences of such appropriation. Thus, beyond all question, a riparian proprietor may use the passing stream in a reasonable manner for domestic uses, or for the irrigation of his lands, or doubtless for other purposes, under the same restriction."

In *Elliott* v. *Fitchburg Railroad Co., 10 Cush.* (*Mass.*) *191; 57 Am. Dec. 85* (*1852*), referred to and approved in the *Higgins Case,* a riparian owner on a small brook granted to a railroad company the right to build a dam and reservoir on his lands to supply (by pipe) water to a depot for engines, &c. On this point in the case (which also involved others) the judge declined to charge that if the water was diverted for this purpose plaintiff

was entitled to a verdict for nominal damage without proof of actual damage, and charged that unless plaintiff had suffered actual, perceptible damage in consequence of the diversion the defendants were not liable. On review it was held (Chief-Justice Shaw delivering the opinion) that this direction was right, and he says (*10 Cush.* at *p. 193; 57 Am. Dec. 85*) that the right to flowing water is a right *publici juris* of such a character that while it is common and equal to all through whose land it runs, yet each proprietor has a right to a just and reasonable use of it as it passes through his land, and "so long as it is not wholly obstructed or diverted, or no larger appropriation is made of the water running through than a just and reasonable use, it cannot be said to be wrongful or injurious to a proprietor lower down. What is such a just and reasonable use may often," he says, "be a difficult question, depending on various circumstances." By the opinion (*10 Cush.* at *pp. 196, 197; 57 Am. Dec. 85*) it was further declared that if the diversion was not a reasonable use, or if it caused substantial damage, it was an encroachment for which an action would lie, and that the question in the case was whether in the mode of taking, the quantity taken, or the purpose for which it was taken, there was a reasonable and justifiable use of the water by the riparian owner; his grantee being entitled to claim his rights. And it was declared that the use in question, being lawful and beneficial, must be deemed reasonable, and not of itself an infringement of the plaintiff's rights, if it did no actual and perceptible damage. In *Gardner* v. *Village Trustees, 2 Johns. Ch.* (*N. Y.*) *162; 7 Am. Dec. 526,* also cited and relied on by Chief-Justice Beasley in the *Higgins Case,* the damage to the lower riparian owner was so clear that a preliminary injunction was granted against continuing the diversion for the purpose of supplying a village with water.

So far, therefore, as the decision in the *Higgins Case* is to be considered a controlling authority upon the present controversy, whether a diversion of water for sale to non-riparian owners is of itself an unreasonable use without proof of damage, it appears that the element of actual, perceptible damage to the lower riparian owner was proved in the case, and that this circumstance was expressly relied on as an incident going to make up com-

plainant's case for injunction. The case cannot, therefore, in my judgment, be taken as deciding that diversion for purposes of sale is not in itself a reasonable or lawful use, and that if this diversion be so substantial as not to be discharged under the maxim *"de minimis,"* the right of the riparian owner is violated. There are, however, expressions in the opinion which point to this view. The statement of the chief-justice (*36 N. J. Eq.* (*9 Stew.*) *541*), that at the times of drought, when the water was drawn from the stream by the water company, the natural stream, even if undiminished, was insufficient for complainant's purposes, and that under these circumstances it was found that the abstraction worked a sensible and essential detriment to the complainant, might perhaps be taken to mean that the damage was caused, not by interfering with the actual working of complainant's mill, but by the abstraction of a quantity of water so large as to be apparent and appreciable, and therefore not beneath the protection of any court; and he further says (at *p. 544*) that the abstraction, being made under a claim of right and likely to increase, entitled complainant to present redress in order to prevent the acquisition of a legal right of diversion.

But, subsequent to the filing of the present bill, the subject of diversion of water for sale in substantial quantities and for municipal water-supply has been distinctly and directly raised and decided by the same court and in a case of great importance, which involved, not only the question whether such use was a lawful and reasonable use, but also the question as to the nature of the riparian owners' rights in the flow of fresh-water streams running to tide water, with reference to or in connection with the rights of the state itself, as the ultimate and lowest riparian owner under or along the streams. *McCarter, Attorney-General,* v. *Hudson County Water Co., 70 N. J. Eq.* (*4 Robb.*) *525*. Vice-Chancellor Bergen, August, 1905, on appeal, *70 N. J. Eq.* (*4 Robb.*) *695* (November, 1906). The legislature by an act of May 11th, 1905, prohibited the transportation through pipes, &c., of the waters of any fresh-water river, &c., of this state, into any other state, and authorized the attorney-general to prevent such transportation by application for injunction. The New York and New Jersey Water Company, which (as appears by its con-

tract with defendant, proved in this case) was to receive from the East Jersey Water Company, this defendant, its supply for Staten Island, contracted with the Hudson Water Company for such supply. The quantity proposed to be withdrawn daily seems to have been not over ten million gallons. *70 N. J. Eq. (4 Robb.) 721; 65 Atl. Rep. 499.* On an application by the attorney-general for an injunction against the Hudson Water Company's removal out of the state of the water drawn or proposed to be thus drawn from the Passaic, it was objected, among other points, that the act violated both the federal and state constitution in restricting interstate commerce. Vice-Chancellor Bergen, while holding that the law was not unconstitutional, rested his decision of the case upon the right of the state as riparian owner, and independent of the statute, to enjoin the diversion of the waters of the rivers running to tide water without its consent. The right to an injunction was expressly based (*70 N. J. Eq. (4 Robb.) 535*) on the sovereign right of the state, as the owner of the bed of all tidal streams, and therefore the owner of all the fresh water flowing upon its land, to prevent by injunction any interference with the proper flow of such water, resulting in a diminution of its natural quantity, unless it has authorized such withdrawal.

On appeal the decree for injunction was affirmed, but the right of the state to the injunction was based upon the statute alone, and any expression of opinion was expressly withheld in reference to the grounds on which the vice-chancellor based his opinion, outside of the act of 1905. *70 N. J. Eq. (4 Robb.) 721, 722.* The rights of the state to running water, and its rights as the lowest and ultimate riparian proprietor, by reason of its ownership of the bed of tidal fresh-water streams, were, however, examined carefully at length in the learned opinion of the court delivered by Mr. Justice Pitney, as bearing on the validity of the act of 1905. This examination necessarily included also a general inquiry into the nature of the riparian owners' rights to the diversion of waters for sale, for the reason that it was claimed by the defendants that under the common law of this state, as settled by previous decisions, the riparian owners had such property or right of property in the water flowing over or along their lands as to entitle them to divert the same for the purpose of permanent

abstraction from the stream and for sale as property and the subjects of interstate commerce. This right was claimed to be an absolute right of diversion for such purpose, subject only to the qualification that the diversion must be reasonable and one which did not inflict actual or perceptible damage upon a lower proprietor. This claim, if sustained, placed the riparian owner's right of permanent diversion for sale upon the same basis as his right to use the flow for extraordinary purposes upon or in connection with the riparian lands, viz., manufacturing, irrigation, and the like. The court of errors and appeals denied such natural and absolute right of a riparian owner to acquire ownership as property of the waters of the running stream for the purpose of sale and held that the decision mainly relied on to establish such right—*Cobb* v. *Davenport, 32 N. J. Law (3 Vr.) 369 (1867)*—did not support the contention. It was further declared (*70 N. J. Eq. (4 Robb.) 708:*

"That the ownership of the running waters is limited to a usufructuary interest, without right to divert any from its natural course, saving for the limited uses that naturally and of necessity pertain to the riparian owner, such as the supply of his domestic needs, the watering of his cattle, the irrigation of his fields, the supplying of power to his mill, and the like. This right of user is limited to so much as shall be reasonably necessary, and is qualified by the obligation to leave the stream otherwise undiminished in quantity and unimpaired in quality."

And, further (*Id.*) :

"That riparian owners, as such, have not any such right in or ownership of the waters that flow upon or past their lands as will entitle them to divert portion of the flow and convey it elsewhere for the use of other than riparian owners. * * * Excluding the customary and lawful uses by means of which a riparian owner may properly diminish the flow of a stream, his right of ownership in the residue is the right simply to have the flow continue, * * * a valuable right, but partaking solely of the nature of realty, being, from the nature of things, inseparably annexed to the land itself."

The permanent diversion of the water for sale to non-riparian owners was, as I understand this opinion, held to be an unlawful and unreasonable use of the waters by a riparian owner, and the validity of the act was sustained upon two grounds—*first,* that the state, as the trustee for the public, had a *residuum* of

common and public ownership in the running stream, subject to the exercise of all rights of private riparian owners, which rights, however, include only lawful uses in connection with the riparian land itself and exclude diversion for sale, and that this public ownership of the *residuum* of interest entitled the state, in the common interest, to forbid by statute the transportation out of the state of water drawn from its fresh-water streams. The *second* ground upon which the act was sustained was placed upon the right of the state, as itself a riparian owner, by reason of ownership of the bed of the stream below the tidal flow. This right was affirmed by the court of appeals; the court in this respect unanimously agreeing with the view of Vice-Chancellor Bergen as to the state's riparian rights. This was said to be (*70 N. J. Eq.* (*4 Robb.*) *720*)

"a proprietary right to the continued flow of the stream, which is paramount to the rights of the upper riparian owners to withdraw water for purposes other than those incident to riparian ownership,"

and this riparian right of the state was declared by the court of appeals to be an additional reason for sustaining the act of 1905, it being considered to be an act in conservation of its property right.

On the appeal of the decree to the United States supreme court the question of the nature of the riparian owners' rights in the water of running streams, under the common law of New Jersey previous to the passage of this act and under the decision of the court of errors and appeals, was also directly raised by the appellants. It was contended (as appears by the briefs of counsel, which have been courteously sent to me) that the rights of the state in the running waters of fresh-water streams, either as the owner in trust of the *residuum* or as the ultimate riparian owner, as declared and established by the court of errors and appeals, had the effect of changing by judicial decision the common law of the state, as it was established by decisions made previous to this contract in question, and that because of this change by a subsequent decision of the state court the obligation of the contract was impaired, in violation of the federal constitution. This question, however, was not decided, nor was

any examination made as to the status of the riparian rights of the state. The decree for injunction was affirmed solely on the ground of the police power of the state, and its sovereign right to keep within its own possession and control the waters of its streams flowing to the sea, so long as they are within its borders, and to forbid the diversion of these waters from within its borders. In the opinion of the court of appeals it was suggested that if the right to an injunction under the act was based only on its being considered as an exercise of the police power, and it interfered with any property rights of the defendant, it might be necessary to show a substantial present necessity for the interference, and the right to consider future conditions and necessities in support of the act of 1905 was put on its aspect as a regulation by law in reference to subjects where the state's ownership as trustee or riparian proprietor entitled it to act. But the United States supreme court put the authority for the passage of the act on a broader view of the extent of police power of the state relating to its great streams and declared it to be independent of the title or property right the state might be said to possess. In doing so, however, it is expressly declared in the opinion of Mr. Justice Holmes that the court do not say that the conclusions reached by the state courts in reference to the state's property rights or title did not warrant their conclusion as sustaining the act, nor would they attempt to revise the opinion of the court on the local law, even if that be assumed to be open to review.

This decision of the United States supreme court, putting the affirmance of the decree upon a ground different from that taken by the opinion in our court of appeals, did not affect the binding authority of that decision upon the point now considered, viz., whether the diversion of water by a riparian owner for purpose of sale is a reasonable use of his riparian right. The decision of the court of appeals I take to be final and controlling upon the points that the state is a lower riparian owner, and that as such riparian owner it is entitled to the full flow of the stream in quantity and quality, subject only to the lawful and reasonable uses of the stream by upper riparian owners, and upon the further point that this lawful and reasonable use

is limited to a use or in connection with the riparian lands themselves, and does not extend to a diversion of the waters for purposes of sale. This point was presented and decided in the regular course of the consideration of the cause, and was specially considered. The case is therefore authority on this point, and, while it may be open to the appellate court itself to limit the application of the case on a future review, it is now binding on subordinate tribunals, although the cause was finally disposed of by the United States supreme court on another point, which was also involved and presented in the court below. This is the settled rule in reference to the application of the principle of *stare decisis,* where more than one question is expressly considered and decided. *Railroad Securities* v. *Schutte, 103 U. S. 119, 143; 26 L. Ed. 327 (1880)* ; *Union Pacific Railroad Co.* v. *Mason City, &c., Railroad Co., 128 Fed. Rep. 230; 64 C. C. A. 348 (1904),* and cases cited on appeal, *199 U. S. 160, 166; 26 Sup. Ct. 19; 50 L. Ed. 134 (1905).*

The rule declared in this later decision of the court of appeals, that the uses of the water of a flowing stream, both ordinary and extraordinary, by the riparian owner, must, in order to be reasonable, be connected with the occupation and enjoyment of the riparian lands themselves, and as an incident to such enjoyment, and that the permanent diversion of the waters for non-riparian user and for sale is an unlawful use, is the one now generally, if not universally, adopted; and the courts taking this view also agree that, in order to obtain relief against such unlawful or unreasonable use, it is not necessary that the lower riparian owner show any actual damage. Where such diversion is not admitted to be unlawful, but is claimed as of right, and its continuance is threatened, the prevention of the acquisition of an adverse right to divert is of itself sufficient ground for protection by the court of chancery. It was so finally settled by the house of lords in England in *Swindon Water Co.* v. *Wilts & Berks Canal, L. R. 7 H. L. (Eng. and Ir. App.) 697.* "Such use (a diversion by a water company for purposes of sale) and a claim of a right to make it," said Lord Chancellor Cairns, "in this case, is a use which virtually amounts to a complete diversion of the stream, as great a diversion as if they had

changed the watershed of the country, * * * and is not a use of the stream which could be called a reasonable use by the upper owner. It is a confiscation of the rights of the lower owner. It is an annihilation, so far as he is concerned, of that portion of the stream which is used for those purposes, and is done not for the sake of the tenement of the upper owner, but that the upper owner may make gains by alienating the water to other parties who have no connection with any part of the stream. It is a matter quite immaterial whether any injury has now been sustained, or has not been sustained by the lower riparian owner. If the appellants (the diverters of the water) are right, they would at the end of twenty years, by the exercise of this claim of diversion, entirely defeat the incident of property, the riparian right of the lower owner. That is a consequence which the owner has a right to come into the court of chancery to get restrained at once, by injunction or declaration as the case may be." And this right to protection by the court of chancery, in order to prevent the acquisition of an adverse right, is recognized, I think, by Chancellor Vroom in the *Soc. U. M. Case, supra,* and by Chief-Justice Beasley in the *Higgins Case, 36 N. J. Eq. 544.* Among other leading authorities on this point, these may be added: *Webb v. Portland Manufacturing Co., 3 Sumn. (U. S.) 189; 29 Fed. Cas. 506 (Circuit Judge Story, 1838); New York Rubber Co. v. Rothery, 132 N. Y. 293; 30 N. E. Rep. 841; 28 Am. St. Rep. 575 (1892).*

On this branch of the case, therefore, I reached the conclusion that the diversion of the water by the defendant for purposes of sale is an infringement of the complainant's right as a lower riparian owner to the continued flow of the stream, and that without proof of any actual or perceptible damage, so far as the establishment of its legal right is concerned, if the diversion is of such a perceptible and sensible amount as not to be excluded under the maxim *"de minimis,"* complainant is entitled to resort to this court for protection, in view of the fact, against defendant's claim of the right to divert and to continue the diversion. If this view be correct, the examination in detail of the evidence bearing upon the matter of actual damage, and the extent to which the diversion has so far affected the use

and enjoyment of the complainant's riparian lands, becomes unnecessary for the purpose of settling the complainant's right; but it is of importance in other aspects of the case, viz., as affecting either the right to an injunction or the terms and conditions upon which any injunction should be issued. Voluminous testimony was taken on both sides relating to the general flow of the water in the river, and its decrease within the five or ten years previous to the filing of the bill, and, as connected with these, the actual damage to the use of the parks.' And the mass of testimony on both sides on this subject, being mainly that of nearly a hundred witnesses claimed to be familiar with the stream, was, as I have above pointed out, relevant at the time of the hearing on the question of the infringement of complainant's riparian right, if proof of actual damage was necessary to establish this right. Complainant claims that the result of this evidence is to show that sensible and material injury has been caused, while defendant claims that there has been no such injury and that the damage is nominal or fanciful. On the view of the nature of complainant's right which I have reached, the question of damage is of importance only on the question of the application of the maxim *"de minimis."* And while this maxim may, in view of defendant's claim of right to divert and in increasing quantity, be inapplicable, so far as it is relied on to deprive complainant of a right to present protection by injunction or otherwise, it may be applicable when we come to consider the terms and conditions upon which any injunction should issue. For the protection of the right the lowest flow of the river must, as was pointed out in the *Hudson County Water Co. Case,* 70 *N. J. Eq.* (*4 Robb.*) *721,* be taken to be flow which the unlawful diversion may affect; but an injunction protecting this right might not be equitable if it prevented, during times of flood or waste, the utilization of the surplus water of the stream, and at times when the maxim *"de minimis"* would be applicable.

The defendant produces a comparison of the average amount daily diverted with the average daily flow of the river, including high water and floods, and contends that the right of complainant to be protected at all by injunction must be considered as depending on or affected by this comparison. But for this

purpose the average · flow would be an erroneous standard. For the purpose of ascertaining the flow of the river, its lowest as well as it average flow, in relation to the proportion thereof diverted permanently · by the defendants, nearly all of the evidence of witnesses called to give their recollection, either general or special, of the appearance or flow of the stream at different times within the past ten or fifteen years, presents one feature which deprives it of much weight in settling this question. This is the circumstance that most of this evidence does not afford any basis for specially comparing the flow since May, 1904, with that previous thereto, and therefore necessarily includes the diversion for Jersey City between the years 1899 and 1904, and when the diversion of the water by the defendant itself was more than double that of the subsequent period. This evidence also necessarily includes any decrease in the flow due to the large diversions, not by the defendant, but by Newark and Jersey City, from the tributaries of the Passaic above Little Falls, which amount to the large aggregate of about sixty million gallons daily, nearly three times the amount diverted by defendant at or since filing the bill. And while this general evidence as to the continued and increasing diversions from the river and its tributaries may have a bearing on the right to restrain further or increased diversion, it may, for present purposes, be properly subordinated to the class of evidence in the cause by which the flow of the river and the amounts diverted by the defendant can be estimated by measurements taken at the Society for Useful Manufactures' dam. From these measurements given in detail for every day during the years 1903, 1904 and 1905, I think we may reach a comparison of the diversion with the low flow of the river, approximating reasonable accuracy.

The flow past the West Side Park above the falls is at low water substantially different at times from that below the falls, for the reason that the flow of the entire river is, to some extent, controlled by the dam of the Society for Useful Manufactures erected above the falls. This dam, extending across the river a short distance above the brink of the falls, is now about five feet in height and about three hundred feet in length. It was originally constructed in the early part of the last century for the

purpose of utilizing the great water power of the falls for manu-
facturing purposes, and about 1880 the height of the dam in-
creased and flush boards or temporary crib work constructed on
the dam, and about eighteen inches high, are used during low
water. By this dam the water is impounded, and when the
water is near the top of the dam the back flow reaches about to
the lower boundary of West Side Park, three-eighths of a mile
above. On the side of the river opposite the park, and just above
the dam, is constructed the great raceway of the Society for Use-
ful Manufactures, a system by which the water and at times the
entire flow of the river is carried on three successive levels for
the use of the mills, and is then discharged into the river below
the falls. Each level is about twenty-one feet below the level
above it. The amount of water from the river required by the
Society for Useful Manufactures in ordinary weather and con-
ditions for running all the mills is about four hundred and
seventy-five cubic feet per second during the day and two hun-
dred and fifty cubic feet per second during the night, when only a
portion of the mills run, an average for the twenty-four hours of
about three hundred and sixty-two cubic feet per second. These
quantities, reduced to gallons, are approximately three hundred
and sixteen million during the day and one hundred and sixty-
six million at night. This makes the daily average flow needed
for the Society for Useful Manufactures about two hundred and
forty million gallons. The ordinary flow of the river during any
of the times for which measurements have been given does not
appear to have been sufficient for this supply, and during all that
time the Society for Useful Manufactures, from Saturday night
until Monday morning, shut down the raceway almost entirely,
and, therefore, unless the water is running over the dam at the
falls, almost the entire ordinary flow of the river at the falls is
stopped over Sunday, and reaches none of the riparian lands
below the falls. A glance at the tables (C 22) giving the meas-
urements of the waters flowing through the raceway, from Jan-
uary, 1903, to December, 1905, shows the general effect of this
stoppage of the flow during Sunday, especially when read in
connection with another table, showing the longest period in
consecutive days when the water was below the crest of the dam.

During the three years these consecutive days were—1903, six days; 1904, seven days, and 1905, twenty days. This comparatively large number in 1905 is explained to be due to extreme drought. The total number of days in these three years, when the water was not running over the dam, was seventeen days in 1903, twenty-five days in 1904 and thirty-six days in 1905. In order to approximate the flow of water in the river above the falls in times of scarcity of water, we may take the flow at the Society for Useful Manufactures' dam during some of the summer months. In July, 1904, there were sixteen days (other than Sundays) in which the flow through the raceway was less than one hundred and sixty-seven million gallons per day. On two of these sixteen days the flow seems to have been cut off for special reasons. On ten of these sixteen days the flow was below one hundred and thirty-three million gallons, and on six below one hundred and seventeen million gallons. In September, 1904, on thirteen days (other than Sundays), the flow was below one hundred and sixty-seven million, on twelve of these thirteen it was below one hundred and thirty-two million, on ten below one hundred and seventeen million and on five below one hundred million gallons. In June, 1905, there were eighteen days (other than Sundays) on which the flow was less than one hundred and sixty-seven million, on four of the eighteen less than one hundred and thirty-three million, on ten less than one hundred and seventeen million and on five less than one hundred million. In July there were twenty-four days (other than Sundays) on which less than one hundred and sixty-seven million gallons ran, on twenty-three of the twenty-four less than one hundred and thirty-three million, on nineteen less than one hundred and seventeen million and on eighteen less than one hundred million. During these months in 1905 there was a scarcity of water, and in November of the same year there was also extremely low water in the river, and a period of sixteen consecutive days (including two Sundays) when the flow was less than one hundred and thirty-three million per day, and on ten of these sixteen it was less than one hundred and seventeen million.

The amount given by defendants as their present average diversion, about twenty-two million, is thus a material and sensi-

ble diminution of the entire flow above the falls and passing the West Side Park in times of lowest water, if these figures can be taken as affording a basis for making a reasonably approximate estimate of the amount and proportion of water diverted at such times, and I think they can, for, although any estimate as to the amount diverted daily should take into account the reservoir storage capacity as specially affecting it in times of drought, and allowance should also be made to some extent for low flows through the raceway due to exceptional circumstances, yet there has been no evidence produced by the defendants to show that the allowance fairly made on these accounts would substantially affect the comparison. Taking them into account, these data, as to the flow of the river through the raceway during these extremely dry periods of low water in the river, show that the amount diverted from the stream passing West Side Park above the falls at these periods, bears a substantial and material proportion to the whole flow of the river at those times, apparently not less on the average than one-tenth of the entire flow. That this estimate of the amount of diversion above the falls is not unfair to defendant further appears from the tables defendant had submitted (D 19) showing the estimated flow of water below the falls during these three years. In making these tables there is added to the flow of water through the raceway an estimate of the amount going over the falls, and also the amount diverted above the falls for the use of Paterson, about eight million per day, which is calculated to be returned to the river below the falls and above the East Side Park. The estimates of this entire flow past Paterson below the falls during the dry months of 1904 and 1905, above referred to, show that on the days in those months when the water was low the proportion of the entire flow diverted by defendants was in June, July and September, 1904, from one-tenth to one-twelfth, and in July and November, 1905, somewhat larger. Manifestly this proportion, or anything like it, is too great to be considered as an immaterial diminution of the flow of the river during these low periods, and so far as the amount of it is concerned it is an actual and perceptible diminution of the city's right as riparian owner to the flow of the water

either past West Side Park above the falls or the engine-house lot and the East Side Park below the falls.

On the use and enjoyment of the West Side Park the diversion of the water has some effect, but the character of the improvements made by the city since its purchase upon the strip of riparian land included in the Society for Useful Manufactures' deed has been such as to reduce this effect very materially. This riparian strip was originally low land along the bank of the river and at the lower end toward the falls about eighty feet in width. The bank curves at this locality, and the strip narrows rápidly toward Oldham brook, and at the bridge across the brook where the bank of the river nearly coincides with the "high-water mark" of the deeds. There was considerable low land, also, on the opposite side of Oldham brook and along the river between the high-water line of the deeds and the bank of the river at low water. The city, after its purchase, built a wall about three feet wide at the bottom, along the line of the river at low water, and this wall extended along the entire shore line of the park, both on the river and on both sides of Oldham brook, except about two hundred feet of the end of the park which is toward the falls. This wall is constructed of loose stone, is about three feet in width at the bottom, and three feet high. For nearly all of its length it is at some distance from the high-water line boundary of the deeds, and the quantity of ground between this boundary all the way round and the wall is computed to be about five and one-half acres, or about one-sixth of the whole area of the park. This low land in this riparian strip behind the wall has been filled in and included within the park lands by laying out walks and ornamentation. When the water is six inches over the dam, it rises about a foot above the bottom of this wall, and when the water is very low in the river the bed of the river below and beyond the wall is exposed. This bed, when exposed, is muddy and unsightly. This exposure of the bed of the stream, with perhaps some slight effect the diversion by defendant may have on the use of the river for boating, is a sensible or perceptible effect or damage, and in view of the claim of right to divert, and in increasing quantities, made by defendant, this actual, sensible damage gives

complainant, as to the West Side Park, additional grounds for equitable protection.

The use and enjoyment of the East Side Park does not, however, appear to be in any way directly, sensibly or perceptibly affected by the diversion. This park along its whole shore line is subject to the backwater from the Dundee dam, erected some distance below, and it has never been improved along or near the shore line. This failure to improve has not been due to the diversion by defendant, but to other causes; one of them being the pollution of the stream. The height of water along this shore line of East Side Park is controlled by the height of water at the Dundee dam, and the diversion by defendant has at this point, and under these circumstances, no sensible, practical effect on the supply or flow of water along the shore, or in making any sensible, perceptible change in its shore line. So far, therefore, as relates to this park, the complainant's right to protection as riparian owner must stand simply on the protection against defendant's acquisition of an adverse right under claim of right. The same situation exists as to the engine-house lot; for the evidence does not show that, as to this lot, its use or enjoyment has been as yet affected in any sensible or material way by the diversion of water made by defendant at or since the filing of the bill.

In view of the conclusion I have reached in reference to the right of the complainant as riparian owner to the flow of the river past its lands, it is not necessary, perhaps, to decide the question whether the alleged authority to construct a sewer system to be discharged into the river confers upon it any different or other right to the continuance of an undiminished flow than a riparian owner would have. But as the matters have been fully gone into, both on the proofs and arguments, a brief statement of the view I take of this branch of the case may be given. This claim of right, as I understand it, is that statutory authority was expressly given to construct a sewer system according to a plan to be adopted; that such plan was adopted and included a system of sewers through the streets of the city, finally discharging into the river. From this authority to construct a system discharging into the river, the city claims by implication only, and not by express provisions, legislative authority or right, as against an

upper riparian owner (or occupant claiming under him), to pol-
lute the river by the sewers, and for this purpose to have an un-
diminished flow of the water for diluting the sewage; and as a
special damage resulting from a diminution of the flow it is
claimed that, still being liable to lower riparian owners for pol-
lution of the stream by sewage (notwithstanding the supposed
legislative authority to pollute), the damages which it has been
or may be obliged to pay have been materially increased, by reason
of defendant's diversion of water that would to some extent have
diluted the sewage and thus lessened the claim for damage. This
claim of right has been strenuously urged by counsel; but I am
unable to see that complainant has in this respect any legal or
equitable standing in the case. On the basis of legal right, there
is, as it seems to me, no burden or obligation which can be legally
imposed upon an upper riparian owner, as such, by statute or
otherwise, except in favor of a person standing in relation of a
co-owner or lower riparian proprietor. This duty and its extent
arises and is defined by operation of law, and exists only in favor
of those also entitled as riparian owners to the use of the water
in succession. To one not claiming as a riparian owner, and for
the uses of a riparian owner, there is, in the absence of statute,
no duty or obligation whatever in relation to the flow of water,
nor, as it seems to me, can a statute (without compensation) give,
as against an upper owner, any right to the flow or to use of it
to any other than riparian owners, or to any extent or for any
purpose, except for the use to which riparian owners are as such
entitled to use it.

The city of Paterson, outside of the three tracts of land, none
of which are connected with the sewer system, is not a riparian
owner, and if, as a municipality, it has been authorized to dis-
charge its sewers into the river, no additional burden or obligation
in reference to the flow of the waters can be imposed on upper
riparian owners by statute, by reason of this use of the waters
below them. In *Doremus* v. *Paterson, 65 N. J. Eq. (20 Dick.)
711, 713 (Court of Errors and Appeals, 1903)*, this principle was
applied in favor of complainant in reference to the pollution of
the stream on the complaint of a non-riparian owner who received
water from a lower riparian owner. It was held that no addi-

tional burden in relation to the use of the water could be imposed. Such claim of right or special damage against an upper owner is entirely novel in our jurisprudence, and before being made the basis of equitable relief should, under the ordinary rule, be first established at law; and on this claim of right or damage the complainant's status for equitable relief is very different from that of its claim merely as riparian owner, for on this aspect of the case it will be observed that equitable aid is asked, with the view of further continuance of its pollution of the river, and for this purpose a court of equity is asked to cut off the supply of pure water from several municipalities or companies which had previously derived their supply from the lower Passaic under authority of law, and have been compelled to abandon this supply largely because of this pollution of the river by complainant. As to these municipalities (or the defendant which supplies them) the complainant, making its claim of right as a polluter of the river, would, as it seems to me, have no standing whatever for any equitable relief, and should be left to any legal remedy it might have. So far as this claim is concerned, no case for equitable relief is made out, and complainant must be left to any remedy it may have at law.

I come, now, to that branch of the case which relates to the equitable defences to any injunction or other relief, admitting complainant's riparian right, as above defined, to be established. The single equitable defence reaching to the whole claim for injunction and to the defendant's diversion for all purposes is that of estoppel. This is based on the claim that the complainant was apprised of defendant's construction of its extensive works, including the laying of mains for the different municipalities, that it has sanctioned their construction and use, and has so acquiesced in them as to deprive it of any equity for injunction. The complainant proves that in April, 1898, the mayor of the city of Paterson called the attention of the common council to the operations of the defendant going on at Little Falls, and advised that it be notified not to diminish the flow of water through the city. A resolution of the council was adopted, directing the city counsel to take the necessary steps for this purpose, and the city council prepared a notice to be served on the defendant, relating to the diversion of the water. This notice was signed by the mayor, and

on May 18th, 1898, was served by a clerk in the city counsel's office. The service was made at Little Falls, where the work of construction was then going on, and the person upon whom it was served was the person to whom, after inquiring of persons working on the ground and superintendents of the workmen, he was directed as the person representing the East Jersey Water Company. This person was a Mr. Cattley, who, in answer to the inquiry made for the purpose of serving the notice, said that he was an assistant civil engineer for the company, and he received the notice, apparently with objection. The defendants show at the hearing in 1906 that no such notice was ever received by them; but their proof on this subject is, first, that of Mr. Gardner, who was at the time of the service a comptroller and director of that company, daily in attendance at the company's office in New York, of which he was in charge. He says that the correspondence of the company came to him, and he never heard of this notice until it was proved in court, and that Herchel was the engineer in charge. That the notice never came to the custody of the secretary of that company is further proved by this officer. No proof, however, is offered that Mr. Cattley, upon whom the notice was served, was not in charge of the works at the time it was said to have been served. In my judgment, service of a notice of this character at the place where the work was actually going on was a proper place for service, and the person in actual charge at the time was a proper person to be served, and, further, that the answers made at the time by persons apparently so engaged in and about the work as to point out or indicate the person in charge are *prima facie,* at least, sufficient proof of authority to receive such notice for the purpose of communicating to defendant, and that so far as the mere legality of the serving of notice goes it was sufficient.

But, whether served or not, there is, in my judgment, no estoppel against complainant's protection of its rights as riparian owner by mere silence or failure either to give notice or to bring suit immediately. In *Simmon* v. *Paterson, 60 N. J. Eq.* (*15 Dick.*) *385, 392* (*Court of Errors and Appeals, 1899*), it was held that the acquiescence of the riparian owners, continued for years, did not deprive them of their right of property in the stream,

although it might affect the right to injunction. This legal right of the riparian owner is barred only by an actual grant or uninterrupted enjoyment for twenty years. *Hutchinson* v. *Coleman, 10 N. J. Law (5 Halst.)* 74, 78 *(1828)* ; *Campbell* v. *Smith, 8 N. J. Law (3 Halst.)* 140; *14 Am. Dec.* 400. And an equitable remedy in aid of the legal right is not ordinarily barred by mere acquiescence in a less period, independent of any circumstances raising special equities. None such appear in this case. The complainant here did not by any act or conduct on its part induce the expenditures of defendant on its own land and for its own purposes, and defendant proceeded with them at its own risk. Complainant, having given the notice, was not bound to proceed at once, either at law or in equity, in order to preserve its rights, but was at liberty to delay such proceedings until the extent of diversion was apparent, if defendant chose to proceed. This claim of estoppel, so far as it is set up as a bar to equity relief by way of injunction against any part of the diversion, must therefore be overruled.

There is, however, a special estoppel bearing on the diversion of water for the supply of Paterson and Passaic through the respective companies, the Passaic and Acquackanonk Water Companies. There is an obstacle to disposing of this question, arising from the fact that neither of these companies is a party to this suit. The Passaic Water Company is authorized by its charter, passed before the purchase of the parks, to supply water to the city from the Passaic, and up to 1899 did supply it with water taken at the Great Falls. This becoming polluted, and apparently to such an extent that serious epidemics of typhoid fever resulted, the water company, being under contract to supply the city with water, changed its source of supply to Little Falls, and laid down mains through the city streets for that purpose. Manifestly this change made by the company gives it the right to be heard and its day in court before the present and only supply of pure water for the entire city can be cut off, and it may be that, when its whole case is heard, no injunction should be granted for this diversion, but the city should be left to its remedy for damages. I certainly am not disposed now, and without hearing these water companies, if they desire to be

heard, on the question of the right to the injunction, to proceed, as may be done in the case of the other municipalities, to consider the terms and conditions upon which an injunction should issue; for while complainant, for the protection of its riparian right, may be entitled to a declaration or determination of its right, and ultimately to an injunction for its protection, yet where this protection of a right of this inferior character and importance affects great public interests and necessities, like those of a pure water-supply, such modification or control of the injunction, as to the time it shall issue, or its terms and conditions, should be exercised as may be called for the public interest, while at the same time the private rights of property are fully conserved. *Gray* v. *Cambridge, 189 Mass. 405, 418; 76 N. E. Rep. 195; 2 L. R. A. (N. S.) 976 (1905).*

Assuming complainant's right to the protection of this court to be established, the question of greatest difficulty in the case relates to the manner in which the protection shall be given, and the terms and conditions, if any, which should be imposed. Relief in equity should certainly extend, I think, to a declaration of complainant's right; but under the general practice of the court, and independent of statute, such declaration can be made only as incidental to and the basis of some equitable relief. *3 Dan. Ch. Pr. (6th Am. ed.) *2181, note.* This power has been given to the court of chancery by statute in England, and in a leading case (*Swindon Water Company* v. *Wilts & Berks Canal Co., supra*) was followed in directing the injunction. See *1 Seton Dec. p. 214.*

Complainant, having established its right, is entitled, if the general course of practice be followed, to the equitable relief by which alone the right can be protected, an injunction against its violation. The defendant, however, contends that the case comes within an exception to this general rule protecting property rights by injunction, and under which courts of equity, where the property in question is actually taken for a public use, and serious public injury would result from the injunction, without corresponding benefit or advantage to the public, will decline to issue an injunction, if it is a case where compensation can reasonably be made and defendant is willing to make it. And

the defendant here, by its answer, offers to make compensation, under the direction of the court, for damages resulting from the taking of the water "up to the full capacity of its mains." This course of directing an injunction only in case defendant fails to make compensation in damages has been taken in several cases in this state referred to by defendant's counsel, but, with one exception, has only been taken against complainant's consent in cases where the defendant had the statutory right to appropriate on making compensation, but had taken possession without proceedings for compensation. This was the situation in *Trenton Water Power Co.* v. *Chambers, 9 N. J. Eq. (1 Stock.) 471 (Chancellor Williamson, 1853)*, and *Paterson, &c., Railroad Co.* v. *Kamlah, 42 N. J. Eq. (15 Stew.) 93 (Chancellor Runyon, 1886)*. In both these cases the entry on property was made with the consent or knowledge of the owner, and acquiesced in for long periods of time, during which the company, relying on the consent, or supposed consent, had improved the property. The principle on which compensation was allowed in lieu of injunction in these cases does not reach the present case. In *Ingersoll* v. *Newton, 57 N. J. Eq. (12 Dick.) 367 (Vice-Chancellor Pitney, 1898)*, another case cited, both parties consented that the compensation to the riparian owner should be fixed by the court, if his right was established. See *57 N. J. Eq. (12 Dick.) 392, 393*.

In *Attorney-General* v. *Paterson, 58 N. J. Eq. (13 Dick.) 1 (1899)*, on an application, on the relation of riparian owners, to restrain the pollution of the Passaic river by defendant's discharge of sewage, an interlocutory injunction was ordered, restraining the increase of the quantity of sewage, pending final hearing, but the question of further relief was ordered to await the final hearing, in order to provide, if necessary, for other means of disposition of the sewage. On appeal this order for injunction was reversed, Mr. Justice Van Syckel delivering the opinion of the court. *Simmons* v. *Paterson, 60 N. J. Eq. (15 Dick.) 385; 48 L. R. A. 717; 83 Am. St. Rep. 642 (1899)*. The portions bearing on the point whether complainant is entitled to the exercise of the injunction power are as follows

*(60 N. J. Eq. (15 Dick.) 392; 48 L. R. A. 717; 83 Am. St.
Rep. 642)*:

"Ordinarily, where the riparian owner is injured by an unlawful
diminution of the quantity of water, or by its excessive pollution, when
his legal right is established, he is entitled to the exercise of this power
of injunction. Whether in this case it should be interposed must be
solved by determining whether in the situation of the parties here there
are such circumstances and such equities as may justify the court in
withholding its restraining arm."

Against granting the injunction, were considered to be the
facts that Paterson had, at enormous expense and under legis-
lative authority, put into operation and used a sewerage system
accommodating a population of over one hundred thousand
people, and that by the restraint prayed for this system would be
suddenly destroyed, and the homes of this multitude of people
rendered perilous to health and life and unfit for occupancy, and
that in view of the magnitude of the injury which would fall on
the public by prohibiting the use of the sewers, it would be inequi-
table to enjoin, if relief could otherwise be afforded, and that
the substituted remedy of adequate compensation would be just
and equitable under all these circumstances. The complain-
ants were allowed to amend their bill, or file a new bill for in-
junction, unless the city made compensation, to be determined
by the court, with leave to elect to bring suits at law for dam-
ages.

The city of Paterson has no express statutory authority to
pollute the river by its sewage system, or any authority at all
to condemn riparian or other property rights for that purpose,
and the case is therefore a direct authority to the point that a
court of equity will, when the circumstances and equities re-
quire it, withhold the writ of injunction ordinarily issued for
the protection of property rights, on the condition that compen-
sation in damages be made. But it is clear, I think, that the
circumstances must be exceptional; that the public injury must
be great and manifest, and that there is no other method of
preventing a great public injury, while protecting the individual
property right by the ordinary lawful process. In such cases of
plain and irreconcilable conflict, individual right of protection

must yield, or be varied, to some extent, within the limits of substantial relief. But I do not think this opinion was intended to establish a general exception to the ordinary right of injunction in all cases of riparian rights where the violation was for the purpose of serving the public or some municipality, for in the earlier case (*Higgins* v. *Flemington Water Co., supra*) the same court had expressly held that the fact that the water was diverted for the purpose of supplying a municipality with water was of itself no bar to the injunction, and an injunction was directed. In *Acquackanonk Water Co.* v. *Watson, 29 N. J. Eq. (2 Stew.) 366 (Court of Errors and Appeals, 1878)*, an injunction was also ordered on the application of a riparian owner, restraining a water company from diverting the water of a stream, in violation of his right, for the purpose of supplying a village with water, but no question other than that of right seems to have been considered, nor did the company which denied the right offer to make compensation. In a later case—*Beach* v. *Sterling Iron and Zinc Co., 54 N. J. Eq. (9 Dick.) 65 (1895)*—Vice-Chancellor Pitney held that a riparian owner was entitled to an injunction against the pollution of a stream, and should not be left to his action for damages, as this would amount to compelling him to sell his rights for what a court might ascertain its value to be. The decree was affirmed on his opinion. This appropriation, however, was, it will be observed, by a private person and for private uses, in which the public had no interest, and this is one feature which mainly differentiates this case from the *Simmons Cases* and from the cases decided in other jurisdictions, and so strongly urged by counsel as authorities for limiting complainant's relief to compensation for damages, either at law or in equity, rather than an injunction. In every one of these cases, the diversion or injury complained of was by a municipal corporation, or a *quasi* public corporation, such as a railroad or canal, diverting for public use, and almost without exception they were cases where the corporation had the ultimate right to do the act sought to be enjoined, upon conditions which were imposed by law as conditions precedent for taking property for

public uses. *McElroy* v. *Kansas City* (*C. C.*), *21 Fed. Rep. 257* (*Justice Brewer*), approved by the United States supreme court in *Osborne* v. *Railroad Co., 147 U. S. 258; 13 Sup. Ct. 299; 37 L. Ed. 155,* and *New York City* v. *Pine, 185 U. S. 93; 22 Sup. Ct. 592; 46 L. Ed. 820,* is one illustration of this class of cases. In *New York City* v. *Pine* power of condemnation could not exist, because the diversion of a stream was made by a dam in the State of New York, which affected the flow of the river in the State of Connecticut, where complainant's lands were located, and this exceptional course of compensation in the federal equity court was the only practical method of working out the power of condemnation for public use.

The East Jersey Water Company, the defendant here, is a private corporation only, incorporated under the general corporation law, and has itself no power of condemning or appropriating the water rights in question against the will of the owner. Neither is it by law obligated to supply to the public, or any portion of it, any water diverted by it, and such supply is purely voluntary and a matter of contract on its part. Water companies or municipalities, which by their charters or general laws are vested with power of condemnation for water-supply, have this power only for public use, and are under legal obligation to supply the public, or the portion of it included within the scope of their statutory control. *Olmsted* v. *Morris Aqueduct Co., 47 N. J. Law* (*18 Vr.*) *311*. The fact that the defendant company voluntarily supplies to public bodies the water diverted may show that the diversion of the water, or the bulk of it, ultimately inures to the public benefit, but in the absence of any legal obligation to supply the water for public use, and perhaps for such use only, the diversion by the East Jersey Water Company is not such an appropriation of private property for public use as may, under our constitution, be made upon compensation. For the purpose of this constitutional provision the true criterion by which to judge of the character of the use is whether the public may enjoy it of right or by permission only. *Olmsted* v. *Morris Aqueduct Co., 47 N. J. Law* (*18 Vr.*) *332*. This plain distinction between a public use for which

private property may be taken upon compensation and a public benefit which may ultimately result from the original appropriation of property to private uses is well stated in *Avery* v. *Vermont Electric Co., 75 Vt. 235; 59 L. R. A. 817; 98 Am. St. Rep. 818 (1903)*. If any of the water companies or municipalities supplied by defendant have the ultimate power of condemning the water rights in question, there would seem to be no reason why they should not be allowed to do so upon compensation in aid of the defendant's diversion, making it to that extent strictly a diversion for public use; for while such water company or municipality cannot, by contract or otherwise, delegate to the defendant its power of condemnation, it may itself exercise its own rights of condemnation in connection with a contract with the defendant water company. The decision in *Slingerland* v. *Newark, 54 N. J. Law (25 Vr.) 62 (Supreme Court, 1891)*, seems to cover this point.

For these reasons I conclude that, so far as relates to any increase in the quantity of water diverted, the complainant, for the protection of its rights, is entitled to an injunction restraining such increase, except to the extent indicated in the memorandum I have already sent to counsel. As to the equitable terms or conditions on which the present diversion should be enjoined, including the time when an injunction should be directed to issue, I have already in the same memorandum indicated to counsel the points upon which I desire to hear them, and the decree will be settled after further hearing.